What challenge has been leveled as against the expert reports in terms of qualifications, or is there any doubt raised as to the expertise or the validity of their findings? We certainly don't challenge the qualifications of the experts. They certainly testify at trial. However, we did identify cases on which the Trier Act could reasonably be used to accept their conclusions. What case supports the proposition that the jury can disregard an expert report that has not been contradicted or challenged in some way? I tried to find a case that would support that, and I really couldn't find one. When you go to recite, in our brief, we cite Brown v. County of Massachusetts, we cite the Fernandez case. Those cases stand for a proposition that where the non-legal party or the defendant at trial has not had the burden of proof, there is no way to support their case with expert testimony. The defendant, in cross-examination, can identify bases on which the Trier Act could reasonably be used to accept the defendant's opinions and therefore conclude that they didn't meet their burden. But what we have here is simply an affidavit from your client. Doesn't our case law permit the district court to reject the affidavit, or at least to find it inadequate as against the kind of specificity of the experts here, if it's essentially conclusory? Yes, that's within the court's discretion. Why wasn't this affidavit essentially conclusory? Well, the affidavit identifies specifically that there were two sources of water, water flow on the property, rainwater from the high over New Bern Highway, which flows through the north culvert and goes along the north edge of the property, toward the south end of the property. Well, even that is conclusory. Even that is, you know, I see this and this is what I see. But there's... So it's within his observations. Yes, it's his observations. What is it to say there aren't six other ways in which the water comes? I mean, he is a layperson. Yes, that's correct. A layperson ought to be able to testify about the course of water flow on his own property based on his 29 year experience visiting the property on a regular basis. I mean, his observations are one thing. But when you say that his observations are the best evidence of the course of water flow, when we're faced with expert reports that really dig down, I mean, in a literal sense, to kind of the nuts and bolts of the course of water flow, you know, one of them has to give sway to the other. Well, let me give two points of response here, Your Honor. It's the government's burden to demonstrate that the channels with respect to the the formalities has done upon us for, let's say, applying that test. It's the government's burden to prove that the channels on Mr. Donahue's property have permanent flow or relatively permanent flow. So it's their burden to prove that. And they have an expert monet set specifically. These are perennial streams. And the monet's report, as well as the Scott report, were based on observations in a period of just a few months in 2009. And even the experts essentially concede that those observations alone are not enough to demonstrate permanent flow. And that's why they rely, for example, on the aquavite, the organisms, insects that were found in the channels with supposed to be two life cycles that were supposed to indicate permanent flow. I just mentioned eels, as I recall. Well, and the insects were not found in the channels on Mr. Donahue's property, and the eels were not found in the channels on Mr. Donahue's property. But the Stravics put a distinction between the wetlands that intersect the Donahue property and the wetlands that are nearby the Donahue property. The eels were found not in the wetlands that intersect the Donahue property. The insects and other two-year life cycles don't have that in the channels on Mr. Donahue's property either. And the Stravics put a statement in the report that that could indicate a significant difference in habitat between the channels on Mr. Donahue's property and channels in wetlands and hills. A reasonable trier fact could conclude from that that the government hasn't met its burden of proof to demonstrate relatively permanent flow. And that we're not saying that the trier fact could bind for the government. It's clear that if we agree for some re-judgment, the trier fact could bind that there's permanent flow. But maybe we're getting ahead of ourselves here, at least I am. Because I'm grasping for a roof. It seems to me, as we analyze this case, we have to somehow find a controlling rule, a controlling opinion. And you refer to the plurality opinion in the POTOS. News media likes to make a lot out of fractured Supreme Court decisions. But it's great copy for them. We're the ones who suffer when we have to try to figure out what it means. And in looking at the POTOS, that's, at least for me, not terribly easy. What is the controlling rule? What is the controlling opinion? And that's a different question, perhaps. What is the controlling rule? Throughout this case, we have argued that the POTOS decision does not announce a building standard for future cases. And that the case has to be decided early as well. We have cases that provide some guidance as to how we are to go about looking at fractured opinions and trying to devise some kind of controlling rule from it. I mean, is this a, are we confronted with a Marx situation here? Under this court's precedent in RAPPA, in cases dealing with the Coal Act, the J.D. Real Estate case, the Anchor Energy, the Berlin case, that, those cases say that there are times when there is no building standard. Essentially, those cases say when Marx, the Marx framework doesn't apply and you cannot identify a narrowed opinion that will produce a majority result in a case, there is no building standard in that case. We can't find, out of the cloudy opinion of Justice Kennedy's concurring opinion, some subset from one to the other? That is correct. May we count dissenting votes for purposes of trying to define a controlling rule? The answer is yes, you can do that. In fact, this court has done that. For example, in the State Public Interest Research Group case, where this court, which dealt with contingency enhancements for maternity resorts, this court said, we have all the senators who would be very permissive about contingency enhancements. We have Justice O'Connor who would be more restrictive. In that situation, those five votes, the four dissenters plus Justice O'Connor, produce a consensus around Justice O'Connor's concurring opinion. But the point is that the four dissenters, what really matters to the governing standard is Justice O'Connor's opinion. In other words, while you can certainly look to dissenting votes to establish a building standard, that building standard cannot be a standard that the dissent would accept, but which no one in the variety of concurrence can judge. No one who joins the judgment, in other words. But if we were to find here... Go ahead, finish your talk. I want to make sure I answered your question, Justice. I'm not sure that you have answered his initial question as to what's the rule. Now, there has to be a rule that we follow if it's the pre-Rapinoe rule. What's that rule? The rule, as argued in our brief, is that under swank and riverside bathing, where wetlands are adjacent to navigable, in fact, water, there is cold water at jurisdiction. Where wetlands are not adjacent to navigable, in fact, water, there is no cold water at jurisdiction. That is the rule. You argued that that's the rule that should apply, correct? That's the standard that this court should apply. Well, that surprises me. I would have thought that you would have viewed either of the Rapinoe's rules as being more restricted and urged that Justice Stevens was right. That if it satisfies either of those tests, either the two-pronged Scalia test or the one-pronged Nexus-Kennedy test. I want to make sure. I'm viewing Rapinoe's as stepping back from Rapinoe, as being more restrictive. It seems to me that was the intent of Scalia. More restrictive than riverside bathing or more restrictive than swank. Any decision I would argue is clear that if you don't have wetlands adjacent to navigable, in fact, water, then there is no jurisdiction. I guess it's a question of what is adjacency. If you're arguing adjacency, that's essentially what you're arguing. Okay. As Judge Randell is pointing out, it seems that any of the Rapinoe's opinions are more restrictive. That under adjacency, isn't your property adjacent to the Sawmill Branch? It is not adjacent to the Sawmill Branch. It is adjacent to channels that periodic between rainwater and the Sawmill Branch. It is not adjacent to the Sawmill Branch. Isn't that sufficient under pre-Rapinoe's? Not under swank. It's not. Because neither the Sawmill Branch nor the Sawmill Branch is adjacent to navigable, in fact, water. Those are not navigable, in fact, waters. And so under swank, our argument is that what is required for jurisdiction over wetlands is adjacency to navigable, in fact, waters. And that isn't met here because neither the channels on Mr. Donovan's property nor even the upper portion of the Sawmill Branch itself is a navigable water. In the traditional sense. Does that address your question, Judge Randell? Yes. Can I just back up? I apologize because I know you do. Let me ask you a question. You're arguing that there is a genuine issue of material fact here. Yes. Created by virtue of the affidavit. And by the affidavit and by the flaws in the experts' opinions themselves. They're disclosed in the reports. The fact that those were never found in the wetlands that intersect. The fact that the experts relied on 761 acres of wetlands scattered throughout the upper portion of the Sawmill Branch watershed. Even though that reliance violated the Army Corps of Engineers' own guidelines on how to determine simulated wetlands. That's in the record. Those are bases in the record on which the prior fact could refuse to accept the government's experts' opinions. And that refusal would entitle Mr. Donovan to a verdict in his favor. And therefore, they create an issue of fact. Was there ever an issue raised about the timing of these expert studies? They were done almost 30 years after the fill. That's right. Was there any suggestion of the fact that an expert report of what's a wetland in 2009 may not be probative of what the condition of the land was in 1980? Well, that has been my argument. I didn't say that. It occurred to me just as a common sense matter. But we have no pictures of what anything was in 1980 or 1990. I mean, your client says, you know, when there's no rainfall, everything's dry. Well, but we don't know. He may not have looked out the window on a day when there was no rainfall and things weren't dry. And we don't have anything that kind of corroborates his observations. Well, in part, he doesn't live on the property. It's a property that he's visited. He doesn't live on the property? Which way does that cut? What's that? Which way does that cut? My point being that he visited it on a regular basis over the course of 29 years of owning the property. He didn't, unfortunately, keep a detailed diary of his observations. Because for at least much of the time, he wasn't thinking in terms of litigation or wasn't in need to prove whether there was or wasn't a significant excess or wasn't. Although the case was brought in 1996. So we've had a little time. That's right. All right, we'll hear from you on rebuttal. Thank you. May I please call the court? Catherine Barton for the United States. So perhaps what would be most helpful to the court is for me to start with the governing standard. And this court set forth how it should determine the governing standard in RAPA, where it said that in a fractured decision, an opinion provides the governing rule where a justice or justice who is concurring in the judgment in such a case articulates a legal standard which, when applied, will necessarily produce results with which a majority of the court from that case would agree. I mean, I'm sure that we have... Go ahead. Did we succeed in RAPA in defining some governing principle, some controlling? No. We didn't manage to. No, RAPA was a very different case where... It was a First Amendment case, wasn't it? Right. And the problem in RAPA was that there were not... Well, they were very different. They took different parts of the First Amendment and rendered opinions on that and you couldn't really... You could try to patch those together into something that a majority of the court would agree with if the facts lined up according to those circumstances. That's completely different. But isn't your position here that the evidence here would satisfy under either the Scalia or the Kennedy test? Yes. And since the dissenters are wide open on jurisdiction, you would urge we don't really have to decide? Well... Or we should follow the First Circuit. It's actually the preference that the court decide and decide along with... As the First Circuit and Eighth Circuit did, that most... The Johnson case. Right, Johnson and Bailey. It gives the government a lot of predictability and, in fact, the plurality test, although it would be narrow in many cases, is an easier, straightforward test. As you can tell from what we submitted, the struggle with the court goes primarily to the Kennedy test and it's quite... You know, you have to get that complicated, but... It's very complicated. Yes, but in the end, it's very simple. I mean, it shows that the weapons are so wet that they did rise to students out of the weapons, which is unusual. Those students go down to traditional navigable waters. Those students... The weapons are highly productive. What does the Stroud report say about the wetlands on the Donovan property? It talks about the wetlands intersecting the Donovan property and doesn't really, I mean, doesn't really focus and say, right on the Donovan property, which is what is at issue here, this is what there is as compared to what's everywhere else. Well, first of all, the regulations on wetlands, which have never been... The wetlands themselves, not the streams, provide that a wetland is, once it's regulated to its jurisdictional extent, right, so it's... And we show that the wetland anywhere, the wetland area, anywhere satisfies these requirements as being adjacent to streams or whatever, then the part of the wetland that is also overlaps onto Donovan's property is included in part of that. You can't destroy any part of the wetland. But in fact... And is Phil... Phil had to have been at that southernmost point where the wetland is, presumably? The wetland... Actually, what you can see in the record is the wetland that remains. The record in the case... In the early days, under the first decision, the first summary judgment ruling, the facts... It was disputed that it was almost all wetland. So the delineations you see in the documents in the Stroud report, which were done by Romaine, show only the wetland that remains. Now, the Stroud report also does... If you look at pages... They are... You can see the study points that they used in the Donovan wetland on... Excuse me. It's week 51 of the appendix. So there are points that are... Now, if you look at this, let me clarify. So the yellow square is Donovan, the rectangular is Donovan's property. So there's a bunch of points there. All these little streams that are on A3D property. And then the... The wetland actually extends... The green part is... This is a wetland delineation done from maps and isn't specific to the ground. It's the red and white line that is the actual on the ground where 5,000 delineation. And you can see that there are points on and off on the ground that they have looked at. And that really, that Lennay's exhibit 5 is a good example. So that's the... So the strata there... And in fact, as you'll see, the record of vertebrates that lived for two years that were found in the wetland are point 31 on that map, which is outside of the property. Can you go back a second? I don't think you answered the question that was posed as to the rule. That's an analytical prospect. But what's the rule? So the rule is... What's the rule that you're following and that we should follow? The rule that we follow is that the government can establish jurisdiction under any of the... That's not a rule, that's a result. No, actually, there are two rules because the... Okay, the dissent said that the rule is much broader than Scalia or Kennedy. I mean, Scalia... Scalia's opinion is critical as it is in the agencies that you represent. And any number of opinions now have been critical, but it doesn't apparently cause your clients to blink at all in their enforcement efforts. I mean, Scalia's opinion is you've got to have a definable body of water. Isn't that, in essence, what the plurality opinion says? Adjacency to a definable body of water. Yes or no? Continuous. I mean, do you disagree with that analysis? All right, and the Kennedy opinion says there's got to be some nexus. Okay, all right. It's more of a biological... Okay, so out of those two, what do you tell us rules? And then the dissent. They are both viable rules because the majority of the court would uphold jurisdiction under each case. Uphold jurisdiction, but we don't know what the test is. There are three tests announced. No, because it's sort of... Those two, the allowing of the current, you know, subsumed within... Which one is subsumed? Which one is subsumed and we may or may not know. I mean, that's my position. That's part of the two. There's three. There's the dissents, which is anything goes. No, let me say that actually, and if there isn't a governing rule, then of course we win because the dissent articulating which in front of no government jurisdiction articulated the pre-existing rule... So is your position that the rule we should define from these contested opinions should be either plurality or concurrence? Is that the rule? Judgment should never be established under either. Why not under the dissent? Because the dissent did not hold a judgment. You're basically saying that the dissent said what you just said the rule is. It can be either plurality or concurrence. Well, the dissent said that was the dissent's position. The dissent's position was that it's a very broad rule. And that's why it's a dissent. Yes, but it's not the student's public interest case. It's a very broad rule that was subsumed within it under these two narrow rules. But isn't that really what the First Circuit did in the Johnson case? Isn't that really what the First Federal Circuit has done in this situation? If you do what you're suggesting that we have, so I don't know if there's anything else in particular that we felt was in the court. Clearly it was dissatisfied with Kennedy's stand of the Stroud report. But does the affidavit create an issue of fact? I did landscaping in May of 2009. And the landscaper said, you know, you're going to have to water this. It's all brand new. It costs you a lot of money. I didn't have to water once the entire summer in 2009. Last year, 2010, everything died. I watered all the time and it just died. It was a wet summer. It was very wet. And we've got this testing right during the wettest months. I mean, the film was in 1980. The case was brought in in 96. And we've got hundreds of thousands of dollars worth of minutia focusing on six months. Is that really? Is that really? The final film for which it was in 1980. It wasn't? It was first warned early on. But wasn't that when there was 1.77 acres? I'm sorry, I don't actually remember. But we do know from 96. And anyway, let me say, so the Kennedy test and the Straub report is not dependent. The Kennedy test doesn't depend on the flow. It depends on a significant nexus. And nothing in the Straub report really goes to the issues that are in the affidavit. The affidavit doesn't say that things changed over the years. It says that 2009 was a wet year, which is dealt with by the experts to show that actually it doesn't, but that didn't matter in terms of the base flows and so on and so forth. But shouldn't a jury consider these things? Shouldn't the jury consider the expert reports? I just don't know. There's nothing that presented to leave out any of the facts in the affidavits. All the facts, all the alleged facts in the affidavits, which we are not competent, go to permanence of flow, which is not. Justice Kennedy in the Ponos said that the record showed that jurisdiction might well be established over the lines of the Ponos, even though they were adjacent to many ditches that may have not only intermittently, the record was clear and relevant between lines from traditional and local networks. The connection here, as you said, we have eels living in the waters right below the wetlands showing that their high productivity, it gets downstream and it provides habitat and food and energy for the downstream systems. The tracer dive that was also by the Stroud, done by the Stroud scientists, showed that there's a considerable ecological significance to the transport of water down to downstream waters. And it's impossible for rainfall, huge, huge amounts of rainfall for these things to occur in rainfall as compared to wetlands? Well, actually the eels were not found at a time of huge rainfall. And what I should say is that you can see in the record, channel E is a dry ditch and it's only wet during times of heavy rain. And stream E was dry through most of this time but stream A and the other streams on the property were wet. They are clearly receiving a different influence other than just rain. It is the same  ground water that is flowing along those areas. In fact, even stream E becomes more perennial because it has these ground water seeps. The ground water has this particular characteristic of intersecting with the ground water so that it gives rise to more     perennial      reason why stream A and stream E have this characteristic of intersecting with characteristic of intersecting with  ground water so that